Receipt number AUSFCC-6194490

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BONNIE NEWKIRK, | **Case No.:**  **20-628L** |
| *Plaintiff,* | **Judge** |
| *v.* | |
| THE UNITED STATES, | |
| *Defendant.* | |

## COMPLAINT FOR INVERSE CONDEMNATION

Plaintiff Bonnie Newkirk ("Newkirk" or "Plaintiff"), by her undersigned attorneys, files this Complaint against the United States of America (the "United States" or "Defendant") to, without limitation, obtain just compensation, damages, and restitution, for a taking which damaged Plaintiff and substantially interfered with her use and enjoyment of her real property by the operations of EA-I8G "Growler" jets from Naval Air Station Whidbey Island ("NASWI" or "Ault Field") and the Naval Outlying Landing Field Coupeville ("NOLF Coupeville" or "NOLF") over and around Plaintiff's Property. Plaintiff alleges as follows based upon personal knowledge as to herself and her own acts, and on information and belief as to all other matters.

### STATEMENT OF JURISDICTION

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) as this action seeks monetary compensation from the United States, pursuant to the Fifth Amendment to the U.S. Constitution, for the taking of Plaintiff's private property for public use without just

compensation.

## PARTIES

2.      Plaintiff Bonnie Newkirk is an individual and resident of Washington state, and at all relevant times was and remains a property owner on Whidbey Island, in Island County, Washington (the "Island").

3.      Defendant is the United States of America, acting through the Department of Defense, Department of the Navy, which at all relevant times operated, and was responsible for all flight operations in connection with, NASWI and NOLF on the Island.

## NATURE OF THE ACTION

4.      NASWI is a naval air station of the United States Navy (the "Navy") located on two pieces of land near the Island's City of Oak Harbor and Central Whidbey's Town of Coupeville. The combined population of Central Whidbey Island, the City of Oak Harbor, and North Whidbey Island where the Navy operates is approximately 73,000 as of 2017.[1]

5.      The main portion of the NASWI base known as Ault Field is about three miles north of Oak Harbor and borders Plaintiff's Property. Ault Field is a busy, multi-mission 24-hour-a-day operational facility. NASWI supports the MH-60S Seahawk helicopter and the Boeing EA-18G Growler, P-3C Orion, P-8 Poseidon, EP-3E SPIRAL 3.2.5 MERLIN, and C-40 Clipper fixed-wing aircraft.

6.      Field Carrier Landing Practice ("FCLP") by carrier-based jets such as the EA-18G Growler (the "Growler") is conducted at Ault Field and NOLF. When FCLP training is conducted at Ault Field other types of operations are delayed. Due to the increasing density of aircraft

---

[1] North Whidbey Island, Washington Demographics Data, Town Charts, https://www.towncharts.com/Washington/Demographics/North-Whidbey-Island-CCD-WA-Demographics-data.html

operations at NASWI, Ault Field and NOLF Coupeville are often used simultaneously to handle the greater volume of operations and attendant air traffic.

7.     An operation is defined as either a takeoff or landing. The majority of operations occur at Ault Field. Ault Field is also used as a backup to the NOLF for FCLP during inclement weather. Ault Field is located approximately 600 feet to the west of approximately 196.03 acres of property (the "Estate Property") held by the estate of Vivian Anderson (the "Estate"). Plaintiff is the daughter of Vivian Anderson and holds title to the Estate Property as co-executrix under the Will of Vivian Anderson dated July 2, 1984 in addition to being a beneficiary under the will with an enforceable personal interest in the Estate Property.

8.     Plaintiff has occupied and lived on an approximately 24-acre parcel of the Estate as a tenant since 1979 (the "Residence Property").[2] In addition, Plaintiff owns approximately 26.47 acres of agricultural property outright on the other side of Washington State Route 20. directly east side of the Estate Property (the "Blueberry Property"). Collectively, the Estate Property, the Residence Property, and the Blueberry Property are referred to herein as the "Property" and are further described in Exhibit A, hereto.

9.     The Growler flight patterns at issue in this case run directly over the Property.

10.     During FCLP, pilots perform repetitive "touch-and-go" landings at airfields, which simulate landing on an aircraft carrier. FCLP training exercises involve groups of aircraft flying in patterns to practice touch-and-go landings. In FCLP training, a "touch-and-go" landing is followed immediately by the application of full power and a takeoff executed as one of a series for practice at landings.

---

[2] The mailing address for Plaintiff's residence is 170 West Frosted Road, Oak Harbor, Washington 98277. The Property is more fully described on Exhibit A attached hereto and incorporated herein by this reference.

11.     Each aircraft in turn approaches the runway and touches down, but then takes off again without coming to a stop. The aircraft then loops around and prepares for another landing. During FCLP each aircraft makes multiple touch-and-go landings before stopping to refuel.



**Figure 1**.[3]

12.     FCLP is required flight training that precedes aircraft carrier landing operations and simulates, as near as practicable, the conditions encountered during such landings.

13.     During takeoff and landing at Ault Field or NOLF, whether during FCLP or otherwise, jet aircraft fly at low altitudes over the private property surrounding the landing strip. Noise levels of engines for fighter jets such as the Growler equal or exceed 150 decibels ("dB") at takeoff which is well above the minimum 75 dB noise level identified by the National Academy of Sciences Committee on Hearing, Bioacoustics, and Biomechanics as the minimum level at which hearing loss occurs.

14.     The Navy has conducted flight operations, including FCLP on Whidbey Island since 1967, but the amount of that use has varied dramatically. From 1967 through 1971, the Navy used the Ault Field and NOLF landing strips extensively. After the Vietnam War ended, the Navy's use of Ault Field and NOLF significantly declined.

15.     Following the Vietnam War, the Navy began flying the EA-6B Prowler (the

---

[3] Field Carrier Landing Practice, United States Fleet Force Command,
https://www.public.navy.mil/usff/environmental/Pages/aircrafttraining.aspx

"Prowler") on the Island, and during the 1980's once again began increasing the number of operations and FCLP touch-and-go landings at Ault Field and NOLF. Predictably, litigation ensued[4] and, in addition to paying compensation to Whidbey Island property owners, the Navy ultimately agreed to limit its operations to aircraft with a noise level comparable to, or lower than, the Prowler, and fly fewer flights per year. The Navy had until recently also limited FCLP training flights since the 1990s to weekdays, and not after 10:30 p.m., and with not more than two consecutive days of touch-and-go operations.

16.    In and around January 2009, the Navy began accepting its first Growlers to replace the EA-6B Prowlers. The Growlers are equipped with two General Electric F414 engines capable of producing 14,000 pounds of thrust each and 22,000 pounds of thrust with the afterburner. By comparison, the outgoing Prowlers only produced 10,400 pounds of thrust from each one of its two turbojet engines.

17.    Since the Growler was first introduced in and around 2009, the number of flights and operations at Ault Field and the NOLF has risen. Commencing in and around 2012-2013, the Navy began planning to further increase flight operations at Ault Field and the NOLF with additional Growler jets. The Navy officially released its draft Environmental Impact Statement in November 2016, publicly announcing its plans to make NASWI the center of activity for all Growler operations.

---

[4] *See, e.g.*, *Argent v. United States*, 124 F.3d 1277, 1278 (Fed. Cir. 1997).



**Figure 2**.[5]

18.    Then, on or about June 25, 2018, the Navy announced it was relocating 36 additional Growlers and supporting personnel to NASWI. The Navy's final Environmental Impact Statement ("EIS") was published on September 28, 2018.[6] On March 8, 2019, the Navy announced its decision under Section 106 of the National Historic Preservation Act to centralize and expand Growler squadron operations on the Island even though it would have a harmful effect on the Central Whidbey Island Historic District.

19.    On or about March 12, 2019, the Navy made final its decision to bring 36 additional Growler jets to the NASWI, for now bringing the total number to 112. Under the March 12, 2019 Record of Decision (the "Record of Decision") for the Final Environmental Impact Statement for

---

[5]  Growler Aircraft Operations at NAS Whidbey Island and OLF Coupeville, https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf.

[6] Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, WA, September 2018, prepared by United States Department of the Navy.

EA-18G Growler Airfield Operations at Naval Air Station Whidbey Island Complex, Island County, Washington, the Navy will not only add 36 Growler aircraft to Naval Air Station Whidbey, but will also increase the number of operations from 84,700 to 112,100, including an increase in total FCLP operations from 17,400 to 29,600.

20.     The Navy's announced force structure establishes two new expeditionary squadrons at NASWI. The Navy's Record of Decision states that an estimated 112,100 operations will occur annually, with 88,000 at the busy, multi-mission Ault Field and 24,100[7] at NOLF Coupeville. Thus, roughly three out of four total aircraft operations will be supported by Ault Field when compared to NOLF. 97,500 of the operations will be flown by Growlers, 73,800 of which will be at Ault Field. 23,700 of the operations at NOLF Coupeville will be FCLP.[8]

21.     The Navy's increased and continued ramping up Growler flight operations, including touch-and-go practices and changes in flight patterns, at Ault Field and NOLF Coupeville has resulted in an increase in overflights closer and closer to, and directly over, Plaintiff's Property several times a week (and sometimes several times a day), at times at altitudes lower than 500 feet. The flights occur in the afternoons and evenings, and night flights occur several times per week and last as late as midnight.

---

[7] Each operation translates to 12,050 touch-and-go flights at NOLF.

[8] There is an apparent discrepancy in the math set for in EIS Appendix A, Figure 7-1 at pg. A-142. According to the Total column set forth in Table 7-1, the number of Growler operation is 73,800 plus 11,900 Other Based operations and 2,300 Transient operations which adds up to 88,000 operations at Ault Field, not 73,800.



**Figure 3**.[9]

22.     Prior to 2016, there were approximately 64,300 Growler operations at Ault Field. As of today, the Navy is increasing Growler operations at Ault Field by nearly 10,000, to a total of 73,800 operations. In addition to the increase in Growler operations, the actual manner in which the Growler operations are conducted is significantly different from the flight patterns of prior operations resulting in average DNL noise contours directly over Plaintiff's Property of >75 dB.[10] As a result of the foregoing, the flight patterns of the Growler operations at Ault Field has shifted from the more easterly side of Plaintiff's Property to the west directly over Plaintiff's home.

23.     The Navy's website states that "flying can occur any day of the week depending on

---

[9] https://www.cnic.navy.mil/content/dam/cnic/cnrnw/pdfs/NASWIfactsheets/Whidbey%20Island%20Growler%20OPS%20OLF%20Brochure.pdf

[10] *See* EIS Appendix A, Figure 7-1 at pg. A-142.

mission needs" and on weekends if "dictated by mission needs."[11] The Navy admits it cannot predict how bad the impact of increased Growler and other aircraft operations on Island residents will be as the number of Growler and other aircraft at NASWI continues to steadily increase.

24.     The Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, requires federal agencies, and state and local governments to develop measures to control the harmful effects of noise on the public. To conform with the Noise Control Act, the Department of Defense initiated the Air Installation Compatible Use Zone ("AICUZ") program to protect the public's health, safety and welfare, and to prevent encroachment on military installations.

25.     The AICUZ program identifies uses that are compatible and incompatible with noise levels emanating from activities on military installations. One part of the AICUZ program is to prepare a noise study to define noise exposure contours. In other words, a map showing a graphical display of noise impacts from air operations on the surrounding property.

26.     The AICUZ map generally shows three noise exposure contours: (a) 65-69 dB DNL; (b) 70-74 dB DNL; and (c) 75 dB DM, and greater.

---

[11] *See* https://www.cnic.navy.mil/regions/cnrnw/installations/nas_whidbey_island/om/environmental_support/growler-fact.html (last visited May 20, 2020).



**Figure 4**.[12]

26.     Defendant, by its internal regulations known as Operational Naval Instructions ("OPNAVINST") and by general publication, has determined that properties located within a 65

---

[12] https://www.islandcountywa.gov/maps/Documents/noisezones_small.pdf

dB DNL noise zone and greater are unsuitable for residential use and development. Plaintiff's Property is located in a >75 dB DNL noise zone.

**Suggested Land Use Compatibility in Noise Zones**

| Residential Categories | Noise Zone 1 (dB DNL) | | Noise Zone 2 (dB DNL) | | Noise Zone 3 (dB DNL) | | |
|---|---|---|---|---|---|---|---|
| | < 55 | 55-64 | 65-69 | 70-74 | 75-79 | 80-84 | 85 + |
| Single units; detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; semi-detached | Y | Y¹ | N¹ | N¹ | N | N | N |
| Single units; attached row | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; side-by-side | Y | Y¹ | N¹ | N¹ | N | N | N |
| Two units; one above the other | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; walk-up | Y | Y¹ | N¹ | N¹ | N | N | N |
| Apartments; elevator | Y | Y¹ | N¹ | N¹ | N | N | N |
| Group quarters | Y | Y¹ | N¹ | N¹ | N | N | N |
| Residential hotels | Y | Y¹ | N¹ | N¹ | N | N | N |
| Mobile home parks or courts | Y | Y¹ | N | N | N | N | N |
| Transient lodgings | Y | Y¹ | N¹ | N¹ | N¹ | N | N |
| Other residential | Y | Y¹ | N¹ | N¹ | N | N | N |

**Figure 5**.

27.     The Navy is warning Island residents of "a significant impact on the noise environment" on the Island,[13] reflecting the reality that more people will hear noise more often. According to the Navy, the increase in aircraft operations means the average decibel level will increase in areas near runways such that over 1,300 more people will be living within the 65-decibel or above day-night average sound level contour of the noise map in the future as a result of increasing Growler flight operations.[14]

28.     The Navy also admits the increase in aircraft noise has a real effect on property values,[15] citing a 1991 study by Marvin Frankel which found that in instances of real estate

---

[13] *See* EIS, Volume 1, Executive Summary at pg. ES-5, "Therefore, the Proposed Action would have a significant impact on the noise environment as it relates to aircraft operations at the NAS Whidbey Island complex."

[14] *See* Record of Decision at pg. 8.

[15] *See* EIS Volume 2, Appendix A1, § A1.3.8 "Property Values" at pg. A1-54. "Economic studies of property values based on selling prices and noise have been conducted to find a direct relation. Studies of the effects of aviation noise on property values are highly complex due to differing community environments, market conditions, and methodological approaches, so study results generally ***range from some negative impacts to significant negative impacts***." (Emphasis added.)

impacted by aircraft noise, "a significant segment of buyers lacked adequate information about the noise environment and often overbid, only to be disappointed after purchase."[16]

29.     The Navy admits that property owners who acquired or purchased their property when the location was not experiencing aircraft noise are the most significantly impacted.

> "Frankel classified noise-affected property owners into two groups: one that moved to the location while the environment was quiet but later became noise-impacted and another that purchased from a previous owner while the property was already noise impacted. Frankel concluded that the former group members bore the true financial burden of airport noise."[17]

The Navy also admits that property values and prices suffer from significant discounts as a result of the negative impact of aircraft noise and from increased flight operations.[18] Those owners who acquired or purchased their property after flight operations were already occurring, but later experienced an increase in aircraft noise, also experience monetary loss.[19]

## PLAINTIFF NEWKIRK'S EXPERIENCE

30.     Four generations of Plaintiff Bonnie Newkirk's family have lived on the Island, dating back to 1909. The Property has been in her family and they have farmed it since the end of the "great war" in 1918, long before the Navy arrived. Plaintiff herself has continuously lived on the Property for over 40 years and she continues to own, hold title to, and have a protected interest

---

[16] *Id.* citing Frankel, M., (1991), "Aircraft noise and residential property values: Results of a survey study," *The Appraisal Journal*, Jan. 1991, pp. 96–108.

[17] *Id.*

[18] *Id.* at pg. A1-55 "Enough data are available to conclude that aircraft noise has a real effect on property values. This effect falls in the range of 0.2 to 2.0 percent per dB, with the average on the order of 0.5 percent per dB.

[19] "The Effects of Aircraft Noise and Airport Activity on residential Property Values: A Survey Study," BEBR Faculty Working Paper No. 1450, 1-58, College of Commerce and Business Administration, University of Illinois Urbana-Champaign (April 1988). *See also* Frankel, Marvin. "The Impact of Aircraft Noise on Residential Property Values," Illinois Business Review, Vol. 45, No. 5, 8-13 (Oct. 1988).

in the Property as of the date of this Complaint. The Property comprises approximately 222.5 acres

with scenic views of Dugualla Bay, the nature preserve, protected wildlife habitat areas located

there, and the Cascade Mountains.



**Figure 7**. [20]

      31.    The Property's soil is classified by the USDA as "Prime Farmland". Prime

farmland is a designation assigned by the U.S. Department of Agriculture defining land that has

the best combination of physical and chemical characteristics for producing food, feed, forage,

fiber, and oilseed crops, and is also available for these land uses. Prime Farmland is of national

importance for meeting the nation's needs for food and fiber.[21]

---

[20] https://earth.google.com/web/@48.34869415,-
122.6170406,4.44155076a,3581.91367278d,35y,-53.05880626h,45.01848878t,0r

[21] Soil Survey Staff (1993), "Soil Survey Manual", Soil Conservation Service, U.S. Department
of Agriculture Handbook 18.

32.     The soil on Plaintiff's Property is some of the most productive agricultural soil in Island County. The mild marine climate allows for a long growing season, often from March into November. The Property is also sub-irrigated which allows Plaintiff to produce a wide variety of non-irrigated crops. In addition, the ground is easy to farm because there are no rocks, it is level ground, and weeds are not a material issue.

33.     Today, and in the past, the Property has been used to grow blueberries, cattle corn, wheat, barley, peas, hay, and other crops. Grass hay grown on the Property is of very high quality with extremely good levels of protein, which makes it highly sought by livestock owners on the Island and elsewhere. The Property is highly suitable for farming and has in the past provided good agricultural income to Plaintiff.

34.     Four to six grass hay crops per year could be produced from the Property with very high yields, making the Property among the best grass hay grounds in Island County. The productivity of the soil means that a wide variety of valuable commodity crops has grown well on the Property, including the blueberries grown on part of the Property today. Due to the high productivity of the Prime Farmland soil, the mild climate, sub-irrigation that eliminates the need for irrigation, the number and quality of crops that can be produced on the Property, and the level and essentially weed and rock free quality of the ground, the Property is of local, regional and statewide significance for agricultural production.

35.     Plaintiff currently lives on the Property in a 1,199 square foot three-bedroom, one bath house. In addition, the Property is improved with a barn and two garages. Plaintiff has lived on the Property from at least 1980 until the present. Plaintiff planned to continue to live on and farm the Property for the remainder of her life, just has her family has done for four generations.

36.     However, commencing in and around 2016 and continuing to the present, the

number of Growler and other aircraft flights over Plaintiff's Property began increasing, the altitude at which such flights passed overhead continued decreasing, and the proximity of the overpasses to Plaintiff's Property became closer and closer—at times directly overhead.

37.    During 2018, Plaintiff measured the decibel level of the flights at up to 95 decibels inside the house, and up to 140 decibels outside the house. Plaintiff cannot be outside her home, or carry on a conversation, watch television, or play music inside her home, when the planes are flying. The noise level is so bad it rattles the windows and shakes the entire house on its foundation. The flyovers and noise affect every aspect of Plaintiff's life on the Property.

38.    In addition to the harmful noise levels, the overflights have resulted in high levels of harmful exhaust particles from the Growlers and other aircraft using Ault Field thereby contaminating the Property to the point where Plaintiff finds it very difficult to breathe at times. She must often use a bandana or mask to go outside from time to time, even for such brief periods of time as it takes to move from her house to her car.

39.    The levels of exhaust create health problems because the minute particles lead to the development of heart and lung conditions, including asthma and the development of blocked arteries. Because some of the particles created by jet engine emissions are ultrafine, they can go deep in the lungs, make their way into the bloodstream, and spread to the brain, heart, and other critical organs. In addition to ultrafine particles, high levels of other emissions, including gases called nitrogen oxides and black carbon which are a major component of soot are found in jet engine exhaust and are contaminating Plaintiff's Property.

40.    There are more than 9,000 cattle farms and ranches in Washington, and for many years Plaintiff's family raised and sold Angus cattle on the Property, at one time having a herd size of 200 head. As prime farmland in a moderate climate, the Property is highly suited for use as a

cattle farm. However, noise intensity levels higher that 60 dB severely affects cattle and other domestic animals, adversely impacting their feed intake, growth, and production rates.

41.    Frequent exposure to noise affects the secretory activity of the adrenal cortex and the animals have little motivation to eat due to the resulting slower passage of digested feed thereby contributing to a lower-than-expected rate of body weight gain. It has also been reported, amongst other problems, that production of glucocorticoids is elevated by excessive noise giving rise to a rapid breakdown of glycogen in the muscle cells, leading to a decline in pH and a delay in the temperature drop after slaughter, both of these factors are responsible for pale, soft, exudative meat. Further, reproductive hormones, such as estrogen and progesterone, have been found to respond adversely to noise generated by low-flying aircraft.

42.    Behavioral responses observed under high-noise conditions as indicators of stress in cattle include:

- Animals jumping when exposed to sudden loud noise (90-140 dB), reducing activity and remaining huddled together for up to 30 minutes afterward;

- Animals freezing into a motionless stance, but may afterward become aggressive;

- An increase in defecation reducing both social activities and non-social activities (sniffing, grooming or crawling);

- Adverse behavior, such as kicking or stomping;

- Other escape-type behaviors and intensive flight reaction consistent with a fear response;

- Decreasing time spent foraging (during winter up to a 43% reduction in foraging efficiency); and

- Animals being disoriented and run away.

Studies have also reported primary and secondary effects in terrestrial mammals such as increased glucose concentrations, decreased levels of hemoglobin, increased heart rate, rising estrogen and

falling progesterone levels, increased abortion rates, and a reduction in thyroid activity.[22] Terrestrial mammal studies have shown that noise levels of 120 dB can damage mammalian ears (human and animal), and levels at 95 dB can cause some loss of hearing. As a result of the increase overflights and noise, Plaintiff is unable to use the Property for raising domestic animal farming or ranching.

43.     In addition, Plaintiff has used the Property to board mules and horses which have reacted to the aircraft flyovers with responses including the startle response, freezing (*i.e.*, becoming temporarily stationary), stampeding, and fleeing from the sound source. As of March 2020, Plaintiff boarded three mules on the Property until her mule, Jenny, experienced escape-type reactions when a Growler overflight "spooked" her, causing a startle response which resulted in her fleeing from the sound source as she bolted and ran from the Property into the road where she was struck by a car. Unable to calm her, Plaintiff was forced to call a veterinarian to end Jenny's life.

44.     Plaintiff operates a business grow and sells "U-Pick" and "We-Pick" blueberries on the northeast portion of the Property at a stand known as Bonnie's Blueberries. Plaintiff also leases a portion of the Property to a tenant who grows fruits and vegetables and operates a roadside stand. Plaintiff's tenant also grows hay for dairy farmers on the leased property.

45.     Prior to the increase in overflights and noise Plaintiff operated a robust U-Pick business that drew regular customers from the Seattle area and beyond, who would come and stay for up to a week at a time. Some of the customers were such regulars that Plaintiff was on a first name basis with them. As a result of the increase in overflights and noise, Plaintiff's U-Pick

---

[22] Manci, K.M., D.N. Gladwin, R. Villella, and M.G. Cavendish. 1988. *Effects of aircraft noise and sonic booms on domestic animals and wildlife: a literature synthesis*. U.S. Fish and Wildlife Service, National Ecology Research Center, Ft. Collins, Colorado. NERC-88/29.

business has become virtually non-existent. Plaintiff has fielded (and heard about) numerous complaints about the noise and accompanying startle responses from customers of her tenant and Bonnie's Blueberries.[23] In addition, the exhaust particles are contaminating the fruits and vegetables being grown and sold on the Property by Plaintiff and her tenant.

46.     As part of the increased Growler activity at Ault Field, Defendant also conducts engine testing known as aircraft engine ground run-ups. Ground run-ups are routine aircraft engine maintenance tests performed for extended periods of time generating continuous elevated noise levels to ensure safety and reliable operation of aircraft engines.

47.     Run-ups may be either suppressed or unsuppressed. Suppressed run-ups are those maintenance engine run-ups conducted within the maintenance run-up facility. Unsuppressed run-ups are those maintenance run-ups conducted outside the facility. Maintenance run-ups may be performed at anywhere from idle power to full power.

48.     During Growler engine ground run-ups, Plaintiff endures decibel levels in excess of 100 dB outside her home and the entire house shakes violently. The increased noise from the Growlers has been so bad that there have even been complaints of Growler flights and ground engine run-ups causing a physical vibration and rumble on southern Vancouver Island, British Columbia and the San Juan Islands in San Juan County, Washington.

49.     In the 1970s and 1980s, the military conducted studies of historical accident and operations data. The studies showed that most aircraft mishaps occur on or near the runway on property like Plaintiff's. These areas where an aircraft accident is most likely to occur are designated Accident Prevention Zones ("APZ(s)"). APZs follow departure, arrival, and flight

---

[23] It is rumored that a customer of the tenant's roadside stand had a heart attack during one particularly low overflight.

pattern tracks and are based on analysis of historic data. Approximately half of the Property (110 acres) is located in an APZ.

50.     The use of properties that are located within an APZ is restricted by local authorities pursuant to recommendations from the Navy. While the Navy makes the recommendations, actual restrictions are mandated by the local municipality and/or county as land use control falls under their responsibility. The Navy recommends low-density land uses in the APZ for Plaintiff's Property. In most cases, like here, residential land use is not recommended within the APZs. Accordingly, the uses for Plaintiff's land are restricted, including the potential restriction as to what can be grown on Plaintiff's Property, if anything can be grown at all.

51.     The National Institute for Occupational Safety and Health and the Washington Department of Labor and Industry recommend that if a worker is continually working in hazardous noise areas, he or she should wear some sort of hearing protection. Though many people are unaware of it as it is happening, overexposure to loud noise can gradually damage one's hearing. Noise induced hearing loss is not like other types of hearing loss, and once the damage has occurred no treatment can correct your hearing.

52.     Plaintiff and other workers performing agricultural work on the Property, including Plaintiff's tenant, are at risk of substantial hearing loss and other adverse health effects from overexposure to the noise from Growler overflights. In addition, in order to be able to hire field labor, it will be necessary for Plaintiff to mitigate the engine noise for anyone working on the farm through the use of some sort of hearing protection. There is no hearing mitigation practically available for Plaintiff's customers or the customers of her tenant, just as there is no way to mitigate or take precautionary measure for the annoyance, sleep disturbance, cognitive impairment, cardiovascular disease, and other adverse effects associated with the overflights.

53.    As the Growler operations over the Property have increased, Plaintiff at times is woken from her sleep at night by the jets. At times the noise is so bad she simply has to leave and go elsewhere. The Growler operations and jet noise have negatively affected Plaintiff's use and quiet enjoyment of the Property, and makes it extremely difficult now, if not impossible, to generate an income with any consistency. Several customers of both Plaintiff and her tenant have complained about the frequency of the flights and the associated noise, air pollution, and exhaust particle contamination.

54.    In the last six years, Plaintiff suffered a significant increase in jet noise, vibration, and exhaust particle contamination from the louder Growler jets that fly during the day and into the night over and around her Property as the noise has become substantially louder and the flights more frequent. As a result of the foregoing, the Property has suffered a significant diminution in value proximately caused and as a direct result of the increased Growler and other aircraft operations and jet noise.

## <u>COUNT I</u>

(Inverse Condemnation Under The Fifth Amendment)

55.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 51 as if set forth fully herein.

56.    The Fifth Amendment to the United States Constitution prohibits the Government from taking private property for public use without just compensation.

57.    Plaintiff has a legally protectable property interest in her Property located on Whidbey Island.

58.    The flight paths of the various patterns for flight operations at NASWI and NOLF, were and are over and/or in close proximity to the Property owned by Plaintiff.

59.    The additional operations from the Growler jets and other aircraft as set forth herein

dramatically increased the number of flight operations at NASWI and NOLF. In addition, the Growlers produce significantly higher levels of vibration, jet exhaust particle contamination, and are louder than predecessor aircraft such as the Prowler.

60.     The noise, vibration, and contamination from exhaust particles from the regular, frequent, and persistent flights of the Growlers and other aircraft over and in close proximity to Plaintiff's Property has substantially interfered with her use and enjoyment of such property and has diminished, if not destroyed, Plaintiff's Property's value.

61.     The interference with Plaintiff's use and enjoyment of her property is substantial, and the diminution in value of her property constitutes a taking of Plaintiff's private property for public use by Defendant.

62.     Plaintiff is entitled to just compensation for the value of the property taken, and the diminution in value to any remaining property not taken or partially taken, under the Fifth Amendment to the Constitution. Despite the increase and change in the nature of NASWI flight operations interfering with Plaintiff's quiet enjoyment and use of her property and destroying its value, the Navy has not provided, or offered to provide, compensation to Plaintiff. Plaintiff must therefore incur significant expense in an effort to recover just compensation for Defendant's taking, including without limitation retaining lawyers and experts to file suit.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff requests the Court:

A.  Award just compensation, restitution, and damages to Plaintiff in an amount to be determined at trial to which her is entitled under the Fifth Amendment to the Constitution;

B.  Award declaratory and other equitable relief as is necessary to protect the interests of

Plaintiff;

C.  Award injunctive relief as necessary to protect the interests of Plaintiff;

D.  Award Plaintiff her reasonable litigation expenses and attorney fees, including reasonable costs, disbursements, and expenses for appraisal, engineering, and other expert fees;

E.  Award Plaintiff pre- and post-judgment interest to the extent allowable; and

F.  Award such other and further relief as equity and justice may require.

Dated: May 20, 2020                     Respectfully submitted,

/s/Benjamin H. Richman
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
T: 312.589.6370
F: 312.589.6378

Robert Teel
lawoffice@rlteel.com
LAW OFFICE OF ROBERT L. TEEL
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
T: (866) 833-5529
F: (855) 609-6911

Ronald A. Marron
ron@consumersadvocates.com
LAW OFFICES OF RONALD A. MARRON, APLC
651 Arroyo Drive
San Diego, California 92103
T: (619) 696-9006
F: (619) 564-6665

*Attorneys for Plaintiff*